Good afternoon, Counsel. We've transitioned from morning to afternoon. Yes, ma'am. And good afternoon, Your Honors, and may it please the Court. I'm Peter Breen on behalf of Plaintiff Culture of Life Family Services, otherwise known as COLFS. And I'd like to reserve three minutes for rebuttal, if we can get there. Twenty-five years ago, the FDA declared that the abortifacient activity of mifepristone is antagonized by progesterone, allowing for normal pregnancy and delivery. And since almost 20 years ago, pregnant women have been choosing, in consultation with their physicians, to take supplemental progesterone to counteract their in-progress abortions. And now for over a decade, COLFS, my client, has informed about and provided abortion pill reversal to women in need, including both direct medical assistance and then referrals to other outside providers. And in at least some of the cases where you provide it, you get reimbursed by insurance, right? And yes. And this was a point. There is never an out-of-pocket payment by the woman. That wasn't the question. Yes, Your Honor. So there is an insurance. So that seems like a significant difference between you and the NIFLA plaintiffs. And why isn't that classic commercial advertising? You're advertising a service for which you'll be paid not by the person you're giving it to, but by a third party with whom they have a relationship. It's an odd situation. It's optional. We provide it whether you provide the insurance or whether you don't. Most of the clients are on Medi-Cal, so the insurance isn't accepted for a variety of reasons. But there's lots of, I mean, a lot of medical providers, universities, I mean, lots of entities sell goods and services and sometimes don't insist on payment. But when they're advertising the services that they sell, it's still commercial, right? Well, except, Your Honor, it's very rare that it's optional, literally optional. You don't have to provide the insurance card. You don't have to provide any payment. There's never a cost to her out-of-pocket. It's a matter of she wants to put Blue Cross on the line. But otherwise, there's nothing. And we're talking about an office visit and an ultrasound. Well, then what's the point of even billing at all, then, if it's optional? It's still commercial if you're billing for the services. Well, and, Your Honor, I would say as to if I'll give you the service without whether I bill, whether I don't, it's just a matter of it's like taking a donation for the service. It's totally optional. If you send invoices out or if you apply to medical insurances for coverage, that's commercial. Well, if it was a regular practice, I'd understand. But, Your Honor, this is, again, we provide it for free. None of the other providers would do that. Are you saying the overwhelming majority of the services that are provided are provided without reimbursement? To folks in these pregnancy center circumstances, and this is in the record, Your Honor, COLFS has been proud to help 100 patients have healthy babies over the course of 13 years. So that's less than 10 percent. My question was, are the number of people who are treated overwhelmingly people for whom you do not bill? Right. Yes, Your Honor. The folks that are treated are not. I'm just saying the numbers are small. But you don't even bill a third party? Out of those 100, how many did you get third-party reimbursement for? Minimal, Your Honor, as I understand it. Again, because most folks are on Medi-Cal. We can't take Medi-Cal for a variety of reasons. And so it's really an exception. What are we supposed to do with this? I'll ask you the same question that came up last time, where you're seeking an injunction against the enforcement against anyone, whether or not they get reimbursed. Well, and again, from our perspective, first off, we would say that the overwhelming primary motivation under ERICS, which we think harmonizes first resort with the rest of the body of case law, because first resort is a bit of an outlier nationally, the other circuits have not adopted it, but it harmonized that. You can't say that our primary motivation is economic in that promotion of APR, especially when the majority. So COLS has been able to help 100 women. So that's over the course of 13 years, less than 10 per year have healthy babies. It's helped 400 total. So that means the majority of the people they've even helped, they're not seeing at their clinic. They just say, hey, we'll help you, connect you to a local provider. There's no anything there. It's just help. And so we would say that's still not a primary economic motivation under ERICS. So I'm just wondering about the economic efficiency of this. If the overwhelming number of people you get no reimbursement for, doesn't it cost you more then to bill than it's worth? And why would you do that if it isn't an economic concern?  And, Your Honor, I believe COLS is a full-scale medical clinic. So they've got some other patients who do prenatal care and things like that. So they would have an ability to bill the insurance for those folks. So do we look at the entire spectrum of services in determining whether or not it's a commercial activity, or do we isolate this one segment of it to determine whether or not it's commercial? As I understand, Your Honor, you've got to look at the speech. And so that's to this service that they are offering. But speech doesn't occur in a vacuum. Somebody speaks. And so we have to look at the entity that's speaking. And I'm asking you, when we look at that entity that's speaking, your client, are we looking at speech that's being done by a commercial entity, or are we looking at speech that's being done by a non-commercial entity? So how do we parse that out in terms of your client? And, Your Honor, if the test is speech that does no more than propose a commercial transaction, I would urge that it's the speech that is related solely to this service that we're in front of the court on today. So it's the APR services. And those would be the very specific services that are offered by our client in this context. And I might also point out we have a difference in our case where even if you were to find that we were commercial, the district court held that of the five of the seven categories of speech we're engaged in, they were not inherently misleading. And that finding was not challenged by the attorney general. In fact, it was embraced by the attorney general on appeal. So we're entitled to intermediate scrutiny. Five of seven were not? As I understood it, there were five of the seven that were inherently misleading and two that were potentially misleading. It's actually the reverse, Your Honor. So the finding was that the two that were inherently were the success rate of 64 to 68 and the statements on nonstandard situations. Those were the two that were inherently. The other five were potentially. Right. So reverse reversal, potential. Safe and effective. But I thought you made a different representation. I thought you said that they were. Oh, you would make a distinction between potentially. Yes. And, of course, we believe they're all true. But at the same time, when you've got this test where if something is potentially misleading, which is not a great way of framing your statements, but if it's only that, you get intermediate scrutiny. So you're treated the same as a true statement under a commercial speech analysis. What do we do given your organization's operational model in terms of drawing a line, not suggesting that the record suggests that your organization does this, but you can imagine other nonprofits or businesses that would have lost leaders or they have, again, completely outside of the context of medical care, giveaways to bring people in. And I'm just thinking about our rule rather than the application in this case. Giveaways to bring people in. And they say false or misleading things about the thing they're giving away, but then they make the relationship and contact and are able to do other sorts of business there. How would we draw that line in general? Sure. Your Honor, I think the primary economic motivation test from Eric's gives you what you need there. But do we look at it retail or wholesale? Because they may not have a primary, and this is, I understand, at least part of the logic of first resort, is you may not have the economic. It may not be profitable in the instant to give away one product. You lose money. It's a loss leader. But with respect, and you might, right, so advertisers say, but that's not commercial speech because we're giving that away. But it's part of a broader organization that is generally involved in the provision of similar products that does keep it as a going concern, even as a nonprofit, right? So it doesn't have to be profitable. It simply has to keep the lights on. And, Your Honor, you don't have, there's not evidence of that in this record. Sure. And so that would be something. In terms of how we draw this line where we're saying primary or not. Well, and again, Your Honor, loss leaders and that sort of thing are certainly standard, that would be standard in a commercial speech analysis, I would think. So, but again, to me, that primary economic motivation, if you're literally just giving things away, and so, and in this case, you're bar making no, there's no real profit on the thing. You're giving it away. You'll take the money, you'll not, as a donation. You don't have that. It's just we're outside that test. So, again, I think primary economic motivation can remain as your test, and you analyze the facts as we've seen in the case law. I guess, I'm sorry, but the next question was, so a business, a for-profit business that gives something away but is otherwise making money, I mean, the true loss leader. Are you saying that that falls on the side of commercial speech, that they would be, that their misleading or untruthful advertising would be unprotected as to that loss leader? Well, so if I go in on Black Friday to get my $200 TV at Walmart, yes, I mean, that is. But if no money, they're just giving stuff away to get people in. Right. But to get you into the store to buy things. And so that certainly, I think, would be commercial. Counsel, what's our standard of review on the district court's determination whether something was commercial speech or non-commercial speech? What's our standard of review? I agree with my colleague that that one has got to be de novo when it goes to the facts that are part of your First Amendment analysis because we're entitled to an independent examination. You take a fresh look without deference. But what case are you relying upon to say that it's a de novo determination whether or not speech is commercial or not? I believe that was, it was, this goes back to Hurley in terms of the fresh look. So Hurley is your best case for the proposition that when we review the district court's determination of whether or not speech is commercial, it's de novo? Is the Hurley case what you cite for that proposition? And, Your Honor, I respectfully, I believe my colleague had cited IMDB. It's one of those that we really hadn't briefed carefully. Thank you, Your Honor. As well, Your Honor, I would point out we've really argued hard on ONY so that the fact that our district court credited our experts, found them reliable, weighed the studies, found that at least the majority of the categories of speech were not inherently misleading. Under ONY, the court should have recognized the scientific debate, said I don't have a place here to crush that scientific debate, and allowed it to proceed. Another case that the AG cited that would have a similar, had a similar thought was the Pearson case from Judge Silverman in the D.C. Circuit. In that case, he held for the court that you do not prohibit the speech. They could do disclaimers and things like that, but that is not something that prohibition is correct for. We'd also cited Sorrell and Koronia on this idea that the marketplace of ideas has to be sustained, and that you, especially when the underlying method is legal, the underlying product, service, et cetera, is legal, you do not ban the speech on it. And they quoted Thompson as well for that premise, which is speech is the last thing you regulate, not the first. And here the AG's made a big, big deal out of the fact everything's allowed, everything's allowed. You can speak as a doctor to the patient in the clinic. Colf's staff can speak these words, all of them, to their patients in the clinic, but can't say it to the patients on the website. And again, so we've got to, and we've made a variety of other arguments on free exercise and in terms of the disparate treatment of our clients, but I do want to leave some time for rebuttal. Well, I don't want to cut into your rebuttal, but I'm sure we'll give you some time if you need it. But on the free exercise, what is the comparable secular activity that's not being regulated? So on the face of the statute, you've got government health care providers can make the exact same statements as we can, as we're prohibited from doing. You've also seen with the Attorney General Planned Parenthood can make statements about APR and MIFA-Pristone. We can't, and we believe we've shown that those are false statements, especially they had said that there were no studies at all on it. That's false, even looking at it from our district court's holding. Taking the first one of those, usually when we're looking at comparable activities that are unregulated, we think of the government regulating the private sector, not itself. So why is government speech an appropriate comparator at all? Well, we had cited to the court the PETA versus California Milk Board, where the California Milk Board apparently was communicating deceptively about the state of dairy, and this is a commercial transaction in the state of California. There's nothing stopping a government health care entity from making same statements as ours and not being regulated or making opposing statements to ours not being regulated. So that's on the face of the statute. And we've cited numerous instances where Planned Parenthood was allowed to make the statements, and obviously we've shown other evidence of animus on the part of the Attorney General here, all of it coming after the Dobbs decision. So, again, we were operating for a decade. No issues. What happens? Dobbs happens. You get a reproductive justice unit, a task force, a website, a consumer alert, a hotline. Complaints. You know, they wanted to solicit complaints. They couldn't get any complaints. There was a talk of consumer protection, and yet the consumers don't need to be protected. There's no evidence of harm anywhere on this record. All right. Thank you, counsel. I'll give you a minute or two for rebuttal. Thank you, Your Honor. Good afternoon, Your Honor. May it please the Court, I'm back. Your Honor, this is a very easy case. COLFS advertises abortion pill reversal. It provides abortion pill reversal. It accepts payments for abortion pill reversal. And yet, it has asked the Federal District Court to exempt it through an injunction against the Attorney General from any enforcement by our Office of the Consumer Protection Laws, the UCL and the FAL. Here, the District Court properly held that the speech that they employ is commercial speech. And I would draw your attention to 5ER836. There is the webpage saying, Do you regret your decision and wish to reverse the effects of the abortion pill? We are here to help you. There is an effective process for reversing the abortion pill. Regret taking the abortion pill? Please call now with their phone number. They put in their FAQs that they will accept payment. And only for individuals who cannot pay, they will help with financial need. Or they will help with some financial aid. Excuse me. And their counsel admitted, both here and at the District Court, that they do accept payments for this service. This is quintessential commercial speech. And as the District Court correctly, in our position, all of the speech is inherently misleading. Nevertheless, the District Court, we don't think, was erroneous in finding that for five of the statements, it was at least potentially misleading. But doesn't that bring us back to this problem that there wasn't presented in the District Court the state's interests? Your Honor, I think— You found a case where we've been able to leap ahead of the government itself in asserting its own interests in a heightened scrutiny case. Your Honor, though, I think this is—I don't think this requires specific factual development. This is—this court has already held. Did you argue in the District Court that Central Hudson, in the alternative, that if it's potentially misleading, that Central Hudson was satisfied? We did not argue that. But I will say that this court can affirm on any grounds that the District Court found, and that the District Court held. And the District Court held that we had a substantial government interest, which is supported by this circuit's—by this court's holdings in American Academy and also could properly look at the evidence, which was our enforcement action, and determine that it was narrowly tailored. We go after eight specific statements. Those statements, we have provided evidence to the District Court that those statements are false and misleading. So those—the eight specific statements are in the enforcement action or in this? This has seven statements. Are you talking about the— Sorry, Your Honor. We classify the enforcement—there's the nonstandard situations, which is really about whether the APR works after 72 hours, and separately whether it works after the administration of misoprostol and methotrexate. In our enforcement action, we separate those. That's why we get to eight. In this action, Colf's has combined them into nonstandard situations. And so is it your view that—so the enforcement action is in the record? Yes. And is it your view that that contains the requisite articulation of the state's interest, such that even though you didn't present it to the District Court, it's there in the record? Is that the argument? Yes, Your Honor. I mean, I would say, first, that the substantial government interest in protecting individuals from misleading commercial speech about medical treatments is a legal holding that this Court has already determined in American Academy. Our enforcement action reflects that we are going after different parties for their use of those false and misleading statements in advertisements for a medical treatment. The enforcement action is also the example of the narrowly tailored— it is the government regulation at issue here, and therefore it reflects that it is narrowly tailored under the intermediate scrutiny. Have we ever done that? I mean, so to borrow from another case, it's heightened scrutiny analysis in general, but in this case under central Hudson to say that, well, these are clearly highly important issues with people's health and perhaps lives at stake, but is that something we can do to look and say, well, in general, the tailoring and the interest should be sufficient under central Hudson? Can you give us a case for being able to do that? Your Honor, I don't have a case off the top of my head on that particular issue. What I note, though, is, as Judge Miller pointed out, we think our complaint is the evidence in the record to the extent that the Court believes that American Academy's determination that the protection of consumers from misleading, from false and misleading information in the medical statement is insufficient. Our enforcement action complaint is evidence showing what it is that we're trying to pursue and how we're doing it. On that basis, the District Court was within its purview to hold that we satisfied intermediate scrutiny. I'd also just like to make a quick comment about the free – well, I want to make two quick comments. We talked about ERICS earlier, so I don't want to do a lot more talking about it, but I do think there's this sort of mischaracterization of ERICS that it suggests that somehow primary economic motivation is the be-all, end-all of the Bolger test. In ERICS, the reason that the Court looked at primary economic motivation was because the other two Bolger factors were not very clear. There was a nutritional supplement guide, so it wasn't a standard advertisement, and so that's the first Bolger situation. The second is that it wasn't necessarily advertising a specific product. That's why it turned to the economic factor issue. Here, we don't have that situation. What we have is an advertisement, Regret taking the abortion pill? Please call now. It may not be too late if you contact us immediately. And we have it for a specific product, a specific service, really, is abortion pill reversal. And in this case, there is economic motivation. I will also note they fundraise off using their APR patients, and so that provides even additional evidence, which first resort held was sufficient economic motivation for commercial use. I can't recall which case it was, so excuse me if I'm asking about the last case, but wasn't there some dispute about whether that had been established? Not in Colf's, Your Honor. In Colf's, they put in evidence saying that they used stories about their patients in their fundraising galas. They provided three different galas. They provided transcripts of those videos. They also have a webpage that provides a story. This was their evidence that provides a story of a woman who had received APR with several buttons that say, Donate Today, help women like Stacey. Do we have a case where, I understand, bulger is factors, not elements, but where a case is stood without economic motive? If we take the economic motive out of it, what's a case we should look at to find a finding of commercial speech on the first two factors? So I acknowledge that in first resort there was economic motivation, but they also held that even without economic motivation, there could still be a finding of commercial speech. They based that on Greater Baltimore, a Fourth Circuit case, also noting that economic motivation is not necessary for commercial speech in which the en banc Fourth Circuit remanded back to the district court in order to determine whether summary judgment was appropriate. I will also point to the far- If it's elements or if it's factors, not elements, is that a holding, the economic motive, or the fact that economic motive was unnecessary in first resort? Your Honor, I think it's an interesting question. I think in this situation where ultimately what first resort said was that where the government regulates advertisements for commercially valuable services, it's regulating pure commercial speech, I think that holding encompasses within it this idea that economic motivation is not required. But you're right, it's not a specific holding necessarily. It's all of a piece. Do we have a case that any- I mean, I'm trying to- I've been looking for a case like this, too. Is there one that just comes out and says you don't need the economic motive to satisfy Pulcher? I mean, I would say, Your Honor, that Stolfi in its footnotes suggests this as well. It says that often in the compelled speech context, and compelled speech, the analysis about what the government can require in compelled speech, is a different analysis than when it's restricting false and misleading speech. But the inquiry about whether the speech is commercial or not really should be the same. It's still a fact-intensive inquiry. In Stolfi, this court pointed out that often speech is required that has no economic motivation. And in fact, often in the compelled speech context, Bulger isn't even referred to at all. So I also do want to make sure I quickly address the free exercise point. You know, in our- as we argued, exemptions for government entities under the UCL is just not a comparable secular entity. The government stands in a completely different relationship to the people, the residents of California. There are different accountability measures. There are different requirements. I'll also note, this court pointed out in sort of rejecting a very similar argument in Foothill Christian Academy regarding a similar argument about an exemption for public recreation programs and noted that that exemption made sense because the government itself had more control over those programs. That's a similar situation here. This is- so that is not a comparable secular entity, nor is Planned Parenthood. So the statement that they point to about APR is that APR has never been tested for safety or effectiveness or side effects. Your Honor, that's true. All of the studies that are put forward don't actually test. Even the author of the major study at issue here, Dr. Delgado, who is COLEF's medical director, has admitted in two federal district court cases that his study cannot show causation. It cannot show that APR works, that it causes the outcome that he proposes, that he says that it does. I'll also note, you know, my friend on the other side said, well, all of this happened after Dobbs. But you know what else happened in that time period is three federal district courts on preliminary injunction hearings found that statements that abortion pill reversal was effective, that it was safe, and that it reversed. Three federal district courts found that those statements were false and misleading. That also triggers for the Attorney General a duty to see whether other entities are using that kind of false and misleading statements in their commercial speech. We have not prosecuted COLEF's, but we did prosecute Real Options and Heartbeat International. I will also note, this came up in the NIFLA context, but I do want to make sure it's clear. Our trial has been moved from November to February 23rd, 2026. What was the last thing you said? Our trial was moved from November to February 23rd, 2026. It's still within just a few months. We are in it right now as far as discovery, summary, judgment motions, all the same. Can I ask you, just going back to the commercial, the speech question. It seems like part of your, this isn't the formal doctrinal argument, but I think sort of part of the force of your position seems to come from the idea that they're participating in a market where other people participate commercially even if they themselves are not charging for it. Is that, and there is some intuitive appeal to that idea, but is there a case that says that that is relevant? Your Honor, I mean, First Resort and Fargo, the case that it relied on, both say that particular issue. And I think what First Resort points out, relying on the North Dakota case, is that when you are participating in the marketplace for services, not the marketplace of ideas, it's appropriate to consider your speech commercial. Now, there is, I think this happened in the other argument, so I apologize if I'm conflating the two, but there is this issue about whether there's competition and that abortion pill reversal is rare, which we agree with. But the competition here is not, it is about where a person goes if they have those feelings of regret. Do they go back to their medical provider or do they go to Colts or to any of the other entities? That's the competition here, and that is what they, and the, I believe in this case, there's a declaration from Ms. Cynthia Michelle, and hers is different because she actually did not see it from a website. But there's, never mind, scratch that, I'm confusing the evidence from the other case with the evidence from this case, and I apologize. With that, my time is nearly up, so I'm happy to answer any other questions, otherwise I'll... It appears there are no additional questions. Thank you, Counsel. Thank you very much. Thank you. Let's put two minutes for rebuttal, please. Thank you, Your Honor. To respond to a few notes, the FAQ was brought up previously. I'd like to point out that the district court, in the motion to dismiss order, so that was in the motion to dismiss order, it actually found that the FAQ was informative. And, of course, you know, that sort of test shows that it is, at the very least, intertwined noncommercial and commercial speech, which we know is noncommercial. And that didn't carry over into the PI ruling. In fact, it was not addressed or carried over. We believe we're entitled to a benefit there. We recommended to the court the Riley case, which, of course, held that solicitations are noncommercial, per se, and those successful solicitations lead to more charitable work. So to hold that against us, that we're using the successes... That's a solicitation in the sense of, like, please give money to our organization for charitable purposes, right? And that's actually money coming in, and it's noncommercial. Right, but it's not, please use the service that we're providing, which seems to... Right, but you see, that's a different... They're not asking, well, if anyone can give, obviously, but they're not soliciting money direct out of pocket from the handful of people that are getting the APR services. That's not the point there. We would just note that, again, from Riley. In terms of the safety and effectiveness, we just... There is no evidence on the record that anyone's been harmed, and we're almost 20 years into this, over 10 years at Colts. Again, 400 babies born across, generally, that we're able to assist. And so there is no consumer protection here. There's no consumer to be protected. Women have been choosing this. The problem is, are they going to know that they even have the option? We, in our record, had Dr. Delgado tell the story of a patient who said she called Planned Parenthood. They said, your baby's already dead. There's nothing you can do. That woman had a baby. So that's the marketplace here. When you look at Sorrell and NIFLA, they talk about that it's more important that we express ourselves in these medical areas. But that's the merits of the case. We're here on the injunction piece. But it goes to the injunction, Your Honor. I respectfully submit. I think it all goes together, because in the medical field especially, life-saving, you're dealing with life-saving information. And it's all information here. Well, that begs the question, because we have to look at whether it's misleading. So that's the point we're trying to figure out. And, Your Honor, that Pearson case, again, it was cited by the Attorney General. They had a really good analysis dealing with a supplement manufacturer, made some claims about their supplement. And on three of them, the court said, well, the issues are up in the air. The government can't prohibit the speech unless their studies are well ahead of the manufacturer. The fourth one, they said, well, studies don't even – we're not even sure if the studies say what you've said is correct. The court said, look, let them say it. You can put on a disclaimer, but let them say it. You can't prohibit that speech. So we would urge that. Thank you, Your Honor. Thank you, counsel. Thank you to both counsel. The case is argued and submitted for decision by the court. We are in recess until 9.30 a.m. tomorrow morning. All rise.
judges: RAWLINSON, MILLER, JOHNSTONE